JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re JOHN W. NORLING, et al., <br>                      Debtors. <br> _____ <br> JOHN W. NORLING, <br>                      Appellant, <br>                      v. <br> ELVYN DONAWERTH, et al., <br>                      Appellees. | Case No. SACV 10-01162 DMG <br> Bankruptcy Case No. 8:08-bk-11747-ES <br> Adversary Case No. 8:08-ap-01263-ES <br> **ORDER RE BANKRUPTCY APPEAL** |

This matter is before the Court on an appeal from the Bankruptcy Court. The Court held a hearing on February 24, 2012. Having duly considered the respective positions of the parties, both in their briefs and at oral argument, the Court now renders its decision. For the reasons set forth below, the judgment of the Bankruptcy Court is AFFIRMED.

## I.
## FACTUAL BACKGROUND

Appellant John Norling is a general contractor with substantial experience in the construction trade, including residential remodeling projects. (2 Tr. at 120:3-132:16.)

On March 30, 2005, Norling and Appellees Elvyn and Alice Donawerth entered into a contract whereby Norling would provide construction and remodeling work to the Donawerth's home in Lake Forest, California. (1 Tr. at 16:13-17:22.) The total contract price was for $179,350. (*Id.* at 17:23-24.) Subsequently, the parties modified the contract to include the addition of a skylight and a second-story deck for an additional $33,476.47. (*Id.* at 84:1-24.) With these additions, the total contract price was $212,826.47. The Donawerths made periodic payments to Norling. (2 Tr. at 116:25-117:3.)

Shortly after the project commenced, Norling introduced the Donawerths to two young and inexperienced men who would be working at the job site. (1 Tr. at 15:11-21.) Norling stated that he would be teaching them the trade. (*Id.* at 15:22-24.) Kathy Smouse, a boarder who was at the job site, testified that Norling was only occasionally there and that she never observed him working with the two young men. (*Id.* at 189:13-190:24.)

The Donawerths began complaining to Norling about the progress of the construction project. (*Id.* at 30:10-12.) They became "suspicious" of Norling in mid-2005. (*Id.* at 120:8-11.) Norling provided assurances that the project could be completed on time. (*Id.* at 167:13-19, 167:25-168:11.) He represented that certain work—such as the heating, ventilation, and air conditioning ("HVAC"), plumbing, skylight, and balcony—was complete. (*Id.* at 41:19-24, 61:5-10, 67:6-9, 70:2-6.) Later, the Donawerths began complaining to Norling that the work was not complete and did not comply with the building code. (*Id.* at 30:13-15.) Norling would always assure them that everything was fine. (*Id.* at 153:2-10.)

On February 11, 2006, Alice Donawerth wrote a letter to Norling stating her concerns and demanding that he comply with certain conditions if he wished to go forward with the project. (*Id.* at 30:19-31:22.) Norling signed the letter, indicating his agreement to comply with the conditions. (*Id.* at 30:19-31:22.)

On April 10, 2006, one of Norling's young and inexperienced employees cut into a gas line while trying to repair the floorboard. (*Id*. at 137:22-138:19.) The Donawerths tried to contact Norling, but Norling was out-of-state and non-responsive until April 24, 2006. (2 Tr. at 179:14-17, 182:10-183:1.) The Donawerths eventually terminated Norling in May 2006. (1 Tr. at 137:12-15.) As of April 21, 2006, the Donawerths had expended $190,809.88, of which $148,866.02 was paid to Norling and $41,943.86 was paid directly to suppliers. (*Id*. at 28:13-21.)

The Donawerths contacted Norling's bonding company, HHC Surety Company. (1 Tr. at 27:10-16.) HCC hired Art Renga of Roel Consulting Group to conduct an investigation. (2 Tr. at 5:10-6:1.) Renga found hidden defects in the plumbing and HVAC, and work not performed to code, such as the skylight and upper-deck railing. (*Id*. at 15:12-20, 24:18-24, 73:4-24, 83:9-16.) Renga also found that the windows were installed improperly. (*Id*. at 78:2-7.) Based upon Renga's written findings, HCC paid the Donawerths $10,000—the full amount of the bond. (1 Tr. at 73:12-14.)

The Donawerths filed a complaint in state court for breach of contract and fraud. Subsequently, Norling filed a voluntary petition for bankruptcy under Chapter 7 and the state court action was stayed pursuant to 11 U.S.C. § 362. On July 16, 2008, the Donawerths filed an adversary proceeding in Bankruptcy Court against Norling alleging non-dischargeability under 11 U.S.C. §§ 523(a)(2) and 523(a)(6). The Bankruptcy Court conducted a bench trial from May 24 through May 27, 2010. On the first day of trial, the parties stipulated to dismiss Sakura Norling as a defendant. At the close of the Donawerths' case-in-chief, the Bankruptcy Court granted Norling's motion for nonsuit as to the 11 U.S.C. § 523(a)(6) claim. At the conclusion of the trial, the Bankruptcy Court took the matter under submission.

On June 24, 2010, the Bankruptcy Court issued an oral ruling. In its findings of fact and conclusions of law, the Bankruptcy Court found Norling's debt to the Donawerths non-dischargeable for false pretenses or actual fraud under 11 U.S.C. § 523(a)(2)(A). The Bankruptcy Court entered judgment for the Donawerths in the amount

of $168,028.78. (5 Tr. at 2:15-17:6.) Norling timely appealed. On appeal, Norling contends that the Bankruptcy Court applied the wrong legal standard and that there is insufficient evidence to support its non-dischargeability finding and the amount of damages awarded to the Donawerths.

## II.

## **STANDARD OF REVIEW**

A district court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*. Fed. R. Bankr. P. 8013; *Gebhart v. Gaughan (In re Gebhart)*, 621 F.3d 1206, 1209 (9th Cir. 2010) (citing *Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen)*, 300 F.3d 1097, 1101 (9th Cir. 2002)). Mixed questions of law and fact, such as whether a claim is non-dischargeable, are reviewed *de novo*. *Hamada v. Far E. Nat'l Bank (In re Hamada)*, 291 F.3d 645, 649 (9th Cir. 2002) (citing *Beaupied v. Chang (In re Chang)*, 163 F.3d 1138, 1140 (9th Cir. 1998); *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 792 (9th Cir. 1997) (*en banc*)).

"The clear error standard is significantly deferential and is not met unless the reviewing court is left with a 'definite and firm conviction that a mistake has been committed.'" *Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1136 (9th Cir. 2011) (quoting *Cohen v. U.S. Dist. Court for N. Dist. of Cal.*, 586 F.3d 703, 708 (9th Cir. 2009)) (internal quotation marks omitted). A court's factual determination is clearly erroneous only if it is illogical, implausible, or lacks "support in inferences that may be drawn from facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (*en banc*) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)) (internal quotation mark omitted).

## III.

## **DISCUSSION**

Ordinarily in a Chapter 7 proceeding, an individual may discharge his debts pursuant to 11 U.S.C. § 727. *Sherman v. Sec. & Exch. Comm'n (In re Sherman)*, 658 F.3d 1009, 1010 (9th Cir. 2011). Section 523(a)(2)(A) excepts from discharge any debt

for money, property, services, or credit that the debtor obtained by fraud. *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1220 (9th Cir. 2010). To establish a claim of non-dischargeability under Section 523(a)(2)(A), the creditor must demonstrate five elements: (1) the debtor made representations; (2) at the time, the debtor knew that they were false; (3) the debtor made them with the intention and purpose of deceiving the creditor; (4) the creditor relied on the representations; and (5) the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made. *Id*. at 1222 (quoting *Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1996)).

### A.     The Bankruptcy Court Applied The Proper Legal Standard

####      1.     Inferring Fraudulent Intent From The Totality Of The Circumstances

Norling contends that the Bankruptcy Court erred by applying the wrong legal standard. (Appellant's Opening Br. at 31.) First, relying on *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081 (9th Cir. 2000), Norling maintains that the Bankruptcy Court erred by applying the relaxed totality-of-the-circumstances standard to determine the element of intent rather than requiring direct evidence thereof. (*Id*. at 31-32.)

*Slyman*, however, concerned only the reliance and damages elements. The creditor in that case, a homeowners association, argued that it did not need to show that it had provided services—maintenance and upkeep of common areas and facilities—in reliance on the debtor homeowner's deceptive conduct or that such conduct had proximately caused the debt—homeowners association dues—that the association sought to recover. 234 F.3d at 1085-86. The association cited an earlier case, *Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir. 1996), in support of its argument that a totality-of-the-circumstances test should apply.[1] *Slyman* rejected a totality-of-the-

---

[1] In fact, *Eashai* did not so hold. *Eashai* involved a transaction between a credit card company and a consumer debtor. Because consumer debtors deal directly with third party merchants, it is difficult "for the creditor, who does not deal face-to-face with the debtor, to prove the elements of

circumstances approach in cases between homeowners and homeowners associations, holding that "[a] homeowners association must prove the elements of misrepresentation [sic] and reliance directly and by a preponderance of the evidence."[2] 234 F.3d at 1086. Because *Slyman* involved proof of elements other than intent, it is unilluminating as to the appropriate standard of proof for that element.

In any event, the Bankruptcy Court did not—as Norling contends—rely on a case involving credit card debt. To the contrary, it distinguished those cases and the 12-factor test that they utilize. (*See* 5 Tr. at 7:10-14 ("In cases like [*American Express Travel Related Services Co. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1996)], which was actually a credit card case, the Ninth Circuit has set forth a number of factors that courts can look to to infer intent in the context of use of a credit card. Those factors don't really apply here.").)

Moreover, it is well-established outside the credit card context that "[i]ntent to deceive can be inferred from surrounding circumstances." *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1018 (9th Cir. 1997) (citing *Bear Stearns & Co. v. Kurdoghlian (In re Kurdoghlian)*, 30 B.R. 500, 502 (9th Cir. BAP 1983)); *see also*

---

misrepresentation and reliance." *Eashai*, 87 F.3d at 1087. Given the pitfalls of proving fraud in such circumstances, several courts had adopted a totality-of-the-circumstances test to prove fraud in the credit card context. *Eashai* acknowledged criticism of this approach on the grounds that "it does not consider all of the common law elements of fraud, particularly, misrepresentation and reliance." *Id*. at 1088. *Eashai* thus adopted a 12-factor totality-of-the-circumstances test solely "to establish the element of intent to deceive." *Id*. at 1088. The Ninth Circuit stressed that "a creditor in a credit card kiting case must also prove the other elements of common law fraud, including a false representation, justifiable reliance, and damages." *Id*.

Thus, in *Slyman*, the homeowners association's reliance on *Eashai* was misplaced because, under *Eashai*, the association could not have shown reliance and damages by a totality of the circumstances. Ignoring the association's problematic characterization of *Eashai*, the Ninth Circuit in *Slyman* merely distinguished *Eashai* on its facts—*Slyman* involved a simple two-party transaction, which does not present the difficulty of proof attendant in transactions involving third party intermediaries. *Slyman*, 234 F.3d at 1086.

[2] The element of misrepresentation was at issue in *Eashai*—not in *Slyman*. The point that *Slyman* appears to be making is that the elements of fraud *other than intent* must be proven directly by a preponderance of the evidence.

*McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 607 (9th Cir. BAP 1998) ("Fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct." (quoting *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir. 1985)) (internal quotation marks omitted)); *cf. Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010) (explaining that, to the extent fraudulent intent is an element of non-dischargeability under 11 U.S.C. § 523(a)(4), it "may properly be inferred from the totality of the circumstances and the conduct of the person accused" (quoting *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 904 (7th Cir. 1991)) (internal quotation mark omitted)).

The Bankruptcy Court explained the legal standard as follows: "With respect to the element of fraudulent intent, the Court may infer the existence of intent or deception based upon the totality of the circumstances, on a case-by-case basis." (5 Tr. at 3:10-13.) This was a correct statement of the law. The Bankruptcy Court did not err in considering the totality of the circumstances to determine whether the Donawerths had shown Norling's intent to deceive.

### 2. Reckless Disregard Of The Truth

Norling also maintains that the Bankruptcy Court erred by considering "whether he acted in reckless disregard for the truth of his representations" (5 Tr. at 10:4-5) rather than requiring actual knowledge that his representations were false. (Appellant's Opening Br. at 33.)

"The scienter requirement for a fraudulent misrepresentation is established by showing 'either actual knowledge of the falsity of a statement, *or reckless disregard for its truth* . . . .'" *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 167 (9th Cir. BAP 1999) (quoting *Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 656 (9th Cir. 1978)) (emphasis added) (citing *Nat'l Union Fire Ins. Co., Pa. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 301 (2d Cir. 1996); *Norris v. First Nat'l Bank (In re Norris)*, 70 F.3d 27, 30 (5th Cir. 1995); *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1119 (3d Cir. 1995); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir.

1994); *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1167 (6th Cir. 1985)).

Pointing to *Sabban*'s recitation of the elements of fraud, 600 F.3d at 1222, Norling argues that the Ninth Circuit did not explicitly state that reckless disregard for the truth may satisfy the scienter element. Yet, the fact that *Sabban*—which merely quoted language from *Hashemi*, 104 F.3d at 1125—omitted the "reckless disregard" language cannot be read as a *sub silentio* abandonment of it. Just one year before deciding *Sabban*, the Ninth Circuit confirmed that reckless disregard for the truth can in fact establish fraud. *See Household Credit Servs., Inc. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1145 n.4 (9th Cir. 1999) (citing *Anastas v. Am. Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir. 1996)).

The Bankruptcy Court correctly stated the law. To the extent it found the scienter requirement satisfied through reckless disregard for the truth,[3] the Bankruptcy Court did not err. Finding no error in the Bankruptcy Court's articulation of the law, this Court now turns to the sufficiency of the evidence underlying the Bankruptcy Court's factual findings.

**B.     Sufficient Evidence Supports The Bankruptcy Court's Finding That Norling Committed Fraud**

The Bankruptcy Court found two main categories of misrepresentations: Norling's statements that he had completed certain work—including the implied representation that he had performed the work to code—and Norling's statements that he would supervise his employees. (*See* 5 Tr. at 10:12-13:15.)

---

[3] It appears that the Bankruptcy Court found both actual knowledge and reckless disregard for the truth. In discussing Norling's representations that certain work had been completed and performed up to code, the Bankruptcy Court found that Norling "had knowledge at the time that he made those [representations] that the work was not completed, he knew or should have known the work was not up to code." (5 Tr. at 15:7-8.) Thus, the Bankruptcy Court seems to have concluded that Norling both knowingly misrepresented that certain work was completed and with reckless disregard for the truth represented that the work was performed up to code.

### 1. Misrepresentations That Work Was Complete And Up To Code

#### a. Plumbing

In the fall of 2005, Norling told Alice Donawerth that the plumbing portion of the construction work had been completed. (1 Tr. at 41:19-42:3.) Because of this representation, Donawerth paid Norling in full for the plumbing work. (*Id.* at 42:4-9.) Later, Donawerth discovered an open sewer pipe that had been sealed up in a wall behind the kitchen sink that had been plastered and painted. (*Id.* at 59:3-60:20.) Rather than expelling sewer gases up through the roof, the pipe was venting gases within the wall cavity—a potentially life threatening situation that could cause a fire or explosion. (2 Tr. at 11:1-8, 12:14-23.)

#### b. HVAC System

In November or December 2005, Norling requested payment for the HVAC component of the project. At the time, he told Alice Donawerth that he had completed installation of the HVAC system except for a condenser that needed to be installed outside. Norling further represented that the HVAC system was "all hooked up" and would work as soon as the condenser was plugged in. Based on these representations, Alice Donawerth paid Norling for the entire HVAC portion of the work except the cost of the condenser. (1 Tr. at 61:2-62:7.)

Later, Alice Donawerth discovered that the HVAC system was not at all complete. She found Freon lines rolled up and shoved into a corner of the attic along with a foam-covered copper pipe. These should have been installed inside the wall, which had already been closed up. The pipe carrying water condensation away from the air conditioner was supposed to empty into a drain but was instead taped up and shoved into a vent leading to the bathroom. Similarly, the pan underneath the heater was not connected to a drain and would simply drain into the wall. Other ducting pipes that were supposed to be connected to the heater were hidden in the wall beneath the stairwell, connected to nothing. The entire front of the home was unconnected to heating or air conditioning.

1 The HVAC work could not be completed without cutting into the finished walls.  (*Id*. at
2 62:8-64:14; 2 Tr. at 18:18-19:18.)

### c. Balcony Railing

Another part of the remodeling project involved the construction of a balcony and railing across the back of the house.  Norling reported that certain portions of the balcony and railing were complete and received payment for those portions.  Alice Donawerth subsequently discovered that the work on the balcony had been performed improperly. The railing was dangerous—flexing up to eight inches when leaned upon, even though the building code required it to withstand up to 20 pounds of pressure per square foot. Norling attempted to remedy the problem by running a wire through the railing, but this did not remedy the dangerous amount of give in the railing.  Moreover, the wire prevented a dangerous gap in the railing from ever being connected.  (1 Tr. at 69:13-72:16; 2 Tr. at 24:3-25:19.)

### d. Skylight

Upon learning that the Donawerths were interested in having a skylight installed over the kitchen eating area, Norling told them that he would design and construct one. (1 Tr. at 18:5-21.)  On the night of March 30, 2006 at around 9:30 p.m., Norling came and told the Donawerths that the skylight was "all finished," and requested payment for it.  The Donawerths paid Norling for the skylight but, when daylight arrived the next morning, realized that there were problems with it.  The roof tiles were cracked and broken, the flashing was not connected all the way around, and there were large holes where water could come in.  The skylight did not comply with the building code.  (*Id*. at 66:23-69:2; 2 Tr. at 39:7-20.)

### e. Windows

When the parties discussed various brands of windows, Norling told the Donawerths that he had used and installed ATI windows before, they were good windows, and he liked the company.  Based on this statement, the Donawerths purchased the windows.  Norling had two inexperienced workers install the windows.  After the

installation was complete, the windows did not shut all the way and there were huge gaps around the outside of the windows.  When the Donawerths complained, Norling told them he would fix the windows and stay with the workers to supervise, but then left after less than an hour.  Afterwards, the windows were even more damaged—fewer of them locked—and Norling only fixed a couple of the windows needing repair.  (1 Tr. at 64:15-66:22, 151:2-23.)

### 2. Misrepresentations That Norling Would Supervise His Employees

Norling informed the Donawerths at the beginning of the project that he had hired two inexperienced workers who were just out of high school.  He explained that he was going to teach these young workers the construction business and that he would be at the job site to supervise them.  (*Id.* at 15, 65, 162.)  In fact, Norling was almost never there.  A boarder who lived at the residence—and was present 24 hours per day during several months of the construction—saw Norling at the residence approximately 10 times over the course of the project.  (*Id.* at 15:11-16:12, 187:25-190:1.)

In April 2006, Rob—one of the inexperienced workers—was cutting into the floor with a circular saw when he nicked a gas line multiple times.  As the house began filling with gas, the Donawerths immediately called Norling, who did not respond.  Rob told the Donawerths that he had fixed the leak, but after a few days they could again smell gas.  Between April 13 and April 19, 2006, the Donawerths called Norling at least five times per day in a panic, but he did not return any of their calls even though he had agreed in February 2006 that he would return phone calls within 24 hours.

Norling was in Florida at the time, having failed to inform the Donawerths that he would be gone for a week and a half.  Norling admitted that he had no contingency plan in the event that there was an emergency at the construction site.  Ultimately, the Donawerths had the gas company shut off the gas to the house and hired Orange County Plumbing to repair the leaks.  (1 Tr. at 42:16-52:24, 95:7-16; 3 Tr. at 120:8-17.)

### 3. Discussion

#### a. Intent To Deceive

On this record, there is ample evidence to support an inference of fraudulent intent. Norling's pattern of reporting that specific work had been completed and asking to be paid for that work when in fact it had not been completed or had been completed far below acceptable standards suggests that Norling intended to deceive the Donawerths. In particular, the evidence shows that Norling covered up obviously incomplete plumbing and HVAC ductwork behind walls and then represented to the Donawerths that the work was finished so as to induce them to pay him. Similarly, the fact that he stopped by at night to collect payment for the skylight—a time when the defects in the work were not readily visible—suggests that he intended to deceive the Donawerths that the work had been completed in a competent manner. Finally, Norling's representation that he would personally monitor the inexperienced workers—if not knowingly false—displayed a reckless disregard for the truth of that statement given Norling's almost total lack of oversight and cavalier decision to travel across the country for a week and a half, staying there incommunicado while the inexperienced workers continued to work unsupervised at the Donawerths' home.

#### b. Justifiable Reliance

The Donawerths were justified in relying on Norling's representations that the work was complete. They had no expertise in construction and in fact needed to hire experts to identify the problems once it became clear that the work was not being completed as represented. Moreover, many of the defects were hidden in the walls or under cover of night at the time the Donawerths were induced to make payments.

Norling argues that the Donawerths were not justified in relying on his representation that he would supervise the inexperienced workers because by April 2006, when Rob cut into the gas line, they had already learned that Norling was not adequately supervising his workers. (Appellant's Opening Br. at 47.) As the Bankruptcy Court noted, however, the fact that a general contractor was not continuously supervising

inexperienced workers is not necessarily indicative of a problem because even semi-skilled or unskilled workers can perform certain tasks within their abilities without supervision. (5 Tr. at 11:5-12:5.) Thus, while the Donawerths may have been aware that Norling's supervision was less than ideal, that fact does not render unjustified their reliance that Norling would at least supervise the inexperienced workers when performing potentially dangerous tasks, such as sawing into a floor where gas lines ran underneath.[4]

On this record, the Bankruptcy Court's finding that the Donawerths justifiably relied on Norling's misrepresentations was not clearly erroneous.

### c. **Damages**

As an initial matter, Norling challenges the Bankruptcy Court's damages award of $168,028.78 on the ground that it is based on "many instances" of misrepresentation (5 Tr. at 10:20) without specifying every such instance in the record. (Appellant's Opening Br. at 35.) The Bankruptcy Court offered the parties the opportunity to submit proposed written findings of fact and conclusions of law (5 Tr. at 17:3-6), but neither party did so. As Norling failed to remedy this perceived lack of specificity in the Bankruptcy Court's ruling by submitting proposed findings of fact and conclusions of law, his criticism on this ground is not well-taken.

In its calculation of damages, the Bankruptcy Court found that Norling's fraudulent conduct pervaded the construction project.

> [T]he evidence is really rather overwhelming that most of the work was not completed as represented, was not completed to code, and not only not

---

[4] Norling asserts that the gas line was unexpectedly close to the floorboards and that even better supervision would not have prevented the accident. (Appellant's Opening Br. at 48 n.14.) Yet, even so, had Norling responded to the Donawerths' calls for assistance—as he represented he would in order to convince the Donawerths to allow him to proceed with the project—the damage could have been contained so that the Norlings did not have to contact the gas company and a plumbing company to repair the damage after several days had passed without a response from Norling.

> completed, but the work was done in an unsatisfactory, unacceptable manner.
>
> \* \* \*
>
> My inference is that, by making the statements for the purpose of obtaining money, that the intent was to deceive the plaintiffs or to induce them to make further periodic payments.

(5 Tr. at 14:14-18.) This inference was not clearly erroneous based on the several specific instances in the record where Norling misrepresented the amount and quality of the work completed in order to obtain payment. Moreover, it is supported by the evidence of damages, to which the Court now turns.

The Donawerths suffered two types of injuries. First, they paid money to Norling to which he was not entitled based on his misrepresentations about having completed work that in fact was not completed or was completed in a wholly unacceptable manner. For this injury, the Donawerths are entitled to a restitutionary remedy to recoup Norling's ill-gotten gains. In addition, the Donawerths suffered damages as a result of Norling's efforts to hide the unfinished work. For instance, the Donawerths had to break into walls that concealed unfinished plumbing and HVAC piping. Thus, the Donawerths are entitled to recover "the cost to repair the damage and restore the property to its pretrespass condition." *Kelly v. CB&I Constructors, Inc.*, 179 Cal. App. 4th 442, 450, 102 Cal. Rptr. 3d 32 (2009) (citing *Safeco Ins. Co. v. J&D Painting*, 17 Cal. App. 4th 1199, 1202-03, 21 Cal. Rptr. 2d 903 (1993)).

The Donawerths presented evidence of damages in the amount of $205,028.78, which represents the amount that they spent to repair the damages and complete the construction project after firing Norling.[5] The Bankruptcy Court did not clearly err in

---

[5] The Donawerths originally claimed that their cost of repair and completion amounted to $228,244.78. The Bankruptcy Court largely accepted this calculation but deducted $23,216 for items that it "did not think appropriate to assess as damages": $20,000 for landscaping costs, $540 for time that the Donawerths took off from work to have the gas lines repaired, and $2,676 for labor they had to

-14-

accepting the Donawerth's computation of their damages. The Bankruptcy Court then deducted an additional $37,000 in reaching its judgment of $168,028.78. In explaining this deduction, the Bankruptcy Court reasoned as follows: As of April 21, 2006, the Donawerths had paid Norling $148,866.02 for construction work. In their proof of claim to the bonding company, the Donawerths estimated that Norling had completed 40% of the work correctly. Thus, the Bankruptcy Court purported to deduct 40% (in actuality, it deducted one *fourth*) of $148,000 from the $205,028.78.

The Bankruptcy Court correctly recognized that awarding the Donawerths their full cost of repairing Norling's damage and completing the construction would be inappropriate. Norling cannot be held liable for the Donawerths' entire cost of completing the construction project when the Donawerths would have had to pay for the unfinished work regardless of any fraud.

The Donawerths contracted to pay Norling $179,350 plus $33,476.47 in extra charges (4 Appellant's ER 333), a total of $212,826.47. At the time they fired Norling, the Donawerths had paid Norling and his suppliers a total of $190,809.88 for this work.[6] Thus, based on the work that Norling had represented was already complete, the Donawerths expected to pay an additional $22,016.59 to finish the project. In reality, they had to expend an additional $205,028.78. The difference between their expected and actual cost of completion—$183,012.19—is the amount that they were entitled to recover. It includes both the cost to complete work for which the Donawerths had already paid—which serves as a reasonable proxy for the amount that Norling had fraudulently collected for such work—and the cost of repairs.[7]

---

perform themselves to save money. (5 Tr. at 16:1-5.) Neither party challenges these deductions and the Court assumes without deciding that they were proper.

[6] In addition to the $148,866.02 that they paid directly to Norling, the Donawerths paid $41,943.86 to suppliers for items covered in the construction contract. (*See* 1 Tr. at 28:13-21, 75:5-76:9.)

[7] Norling disputes the Bankruptcy Court's evidentiary basis for finding that he had completed only 40% of the work correctly. This Court need not resolve the issue, however, because the percentage

1    The Bankruptcy Court thus awarded the Donawerths less than the full amount that they were entitled to recover. As this mistake does not prejudice Norling and the Donawerths have waived the issue by failing to raise it on appeal, this Court finds no reason to disturb the Bankruptcy Court's judgment.

Norling takes issue with the Bankruptcy Court's broad brush calculations with respect to damages for work that he represented was completed and up to code but in fact was not. He argues that "specific instances were not cited, nor were there findings with respect to proximately caused damages on a specific, item-by-item basis." (Appellant's Reply Br. at 15.) It is true that the Bankruptcy Court did not delve into that level of specificity during its oral ruling. Yet, the Bankruptcy Court informed the parties that they could submit proposed written findings of fact and conclusions of law if they so wished (5 Tr. at 17:3-6) and neither side did.

Furthermore, the contract itself did not identify specific items to be installed or break down their cost, but rather listed only general categories of work such as framing, insulation, plumbing, and electrical. (4 Appellant's ER 330.) Thus, it would have been impossible for the Donawerths to calculate their damages item-by-item other than by reference to the cost of replacement and repair, which they did itemize in detail. (Tr. Ex. 14.) Although the Donawerths' total cost of project completion vastly exceeded the amount that they had already paid, there is nothing in the record showing that Norling carried his burden of establishing any affirmative defense of set-off or failure to mitigate damages on an item-by-item basis. Given the direct evidence of Norling's false representations about the completion of work in specific instances and the absence of a successful affirmative defense, the Bankruptcy Court reasonably concluded that the fraud was widespread throughout the project and calculated damages based on the project rather than item-by-item.

---

of work properly performed is relevant only to determine the breakdown between restitution for money collected fraudulently and damages for repairs. The amount of the Donawerths' total injury is not dependent on this breakdown.

## IV.
## **CONCLUSION**

In light of the foregoing, the judgment of the Bankruptcy Court is **AFFIRMED**. **IT IS SO ORDERED**.

DATED:  March 19, 2012

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE